UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Kemelle Howell, individually and on behalf
of similarly situated individuals,

    *Plaintiff*,

v.

Bumble, Inc., *et al.*,

    *Defendants*.

No. 21 CV 6898

Judge Lindsay C. Jenkins

**MEMORANDUM OPINION AND ORDER**

In her amended complaint, Plaintiff Kemelle Howell brings this class action against Defendants Bumble Inc. ("Bumble"), Buzz Holdings L.P. ("Buzz Holdings"), and Bumble Trading LLC ("Bumble Trading") for alleged violations of the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1 *et seq.* [Dkt. 22.] Howell claims that Defendants own, operate, market, and advertise Badoo, a popular dating app. She seeks to hold Defendants accountable for Badoo's profile verification feature, which allegedly collects users' biometric identifiers in violation of several provisions of BIPA. [*Id.* ¶¶ 8–10, 39, 72–82.]

Before the Court is Defendants' joint motion to dismiss for lack of personal jurisdiction. [Dkt. 35.] For the reasons stated below, jurisdictional discovery is needed to determine which if any Defendant is subject to personal jurisdiction in this Court. Accordingly, Defendants' motion to dismiss is denied without prejudice to renewal after limited jurisdictional discovery is conducted.

1

## I.    Background[1]

Badoo is "the most-downloaded dating app in the world" [Dkt. 22 ¶ 1]; since its 2006 launch, it has been downloaded by hundreds of millions of users, including many Illinois residents [*id.* ¶¶ 40, 42]. Howell has been an active Badoo user since 2016. [*Id.* ¶ 26.] Like many dating apps, Badoo takes measures to combat the creation of fake accounts—those that display profile pictures bearing no likeness to the actual users operating them. At issue in this case is one such measure, a profile verification feature Badoo implemented in 2016 to visually compare its users with their profile pictures. [*Id.* ¶ 44.] The process is straightforward. The app prompts the user to take and submit a self-portrait, or selfie. [*Id.* ¶ 47.] The selfie is compared to the profile picture of the user who submitted it. [*Id.*] If Badoo determines that the person in a selfie is the person depicted in the account's profile picture, the profile receives a stamp of approval indicating that the profile has been verified. [*Id.*] All new Badoo users must verify their profiles in this way, and existing users whose profiles are flagged as potentially fake may be required to do so as well. [*Id.* ¶ 45.]

This suit concerns the technology Badoo uses to compare submitted selfies to users' profile pictures. Much of that work is done by human reviewers, but Howell alleges that Badoo also employs facial recognition technology. [*Id.* ¶ 48.] She deduces

---

[1]    As the Court will discuss in greater detail below, in this procedural posture, the jurisdictionally relevant factual allegations in Howell's complaint are not entitled to the broad presumption of truth that ordinarily applies at the motion to dismiss stage. *See Cent. States, Se. & Sw. Areas Pension Fund v. Phencorp Reinsurance Co.*, 440 F.3d 870, 876–78 (7th Cir. 2006). The Court defers in-depth discussion of the contested jurisdictional facts until later, while briefly recounting the factual allegations underlying Howell's BIPA claims, which are presumed to be true for purposes of ruling on Defendants' motion to dismiss. *See Smith v. First Hosp. Lab'ys, Inc.*, 77 F.4th 603, 607 (7th Cir. 2023).

this fact from the app's ability to instantaneously distinguish "human and non-human faces." [*Id.* ¶ 49.] Whereas human photographs take roughly one minute to verify, the app immediately rejects photographs of non-human subjects, such as "a cat or a glass." [*Id.*] In Howell's view, the app's ability to screen out pictures that do not depict human faces means Badoo must be using "face geometry scans" to collect "face geometry data on the unique points and contours … of each [user's] face," from which Badoo "create[s] a template" for each user. [*Id.* ¶ 48; *see also id.* ¶ 49 n.12 (linking to Badoo's privacy policy, which references the use of facial recognition technology); ¶¶ 50–51 (describing use of such technology in another context).]

Howell has verified her profile "multiple times." [*Id.* ¶ 26.] In other words, she has submitted several selfies to the app, which have allegedly been scanned by the Badoo's "facial recognition software." [*Id.* at ¶ 55.] She was never (1) "inform[ed]" that the app was "collect[ing] or stor[ing]" her biometric data; (2) "informed … in writing of the specific purpose and length of term for which" that data was "being collected, stored, and used"; (3) or asked to authorize this activity in "a written release." [*Id.* ¶¶ 56–58.] Moreover, the app did "not provide a publicly available retention schedule specifying the period of time for which … [her] faceprint" would be retained. [*Id.* ¶ 60.] This conduct, Howell argues, violates BIPA. [*Id.* ¶¶ 72–91.]

## II. Legal Standards

The veracity and legal merits of Howell's allegations are not before the Court. Instead, the legal standards that apply are: (1) the scope of personal jurisdiction, (2) the standard governing motions to dismiss under Federal Rule of Civil Procedure 12(b)(2), and (3) the standard applicable to requests for jurisdictional discovery.

### A. Personal Jurisdiction

"A federal court sitting in diversity must rely on the law of personal jurisdiction that governs the courts of general jurisdiction in the state where the court is sitting," here Illinois. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002); *see* Fed. R. Civ. P. 4(k)(1)(A). The Illinois long-arm statute "permits its courts to exercise jurisdiction on any basis permitted by the Illinois and United States Constitutions." *Hyatt*, 302 F.3d at 714 (citing *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.* ("*Reimer Express*"), 230 F.3d 934, 940 (7th Cir. 2000)); 735 ILCS 5/2-209(c). The due process protections of these Constitutions are not necessarily coextensive, *see Hyatt*, 302 F.3d at 715; *Rollins v. Ellwood*, 565 N.E.2d 1302, 1314–16 (Ill. 1990), but "[no] party urges that the Illinois due process analysis differs," so the Court "only consider[s] the requirements of federal due process," *NBA Props., Inc. v. HANWJH*, 46 F.4th 614, 620 n.15 (7th Cir. 2022) (cleaned up).

The Due Process Clause of the Fourteenth Amendment "protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72 (1985) (cleaned up). To this end, it permits courts to exercise personal jurisdiction over an out-of-state defendant only if that defendant has "sufficient minimum contacts with [the forum State] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Tamburo v. Dworkin*, 601 F.3d 693, 700–01 (7th Cir. 2010) (cleaned up). Personal jurisdiction may be general or specific, *see Daimler AG v. Bauman*, 571 U.S. 117, 126–27 (2014), but in both cases, a key issue is foreseeability: whether "the

defendant's conduct and connection with the forum are such that [it] should reasonably anticipate being haled into court there," *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Howell does not argue that the Court has general jurisdiction over Defendants; only specific jurisdiction is at issue here.

Specific jurisdiction "covers defendants less intimately connected with a State [than general jurisdiction], but only as to a narrower class of claims." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). To establish specific personal jurisdiction over a defendant, the plaintiff must show: "(1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in the state; (2) the alleged injury arises out of or relates to the defendant's forum-related activities; and (3) [the] exercise of personal jurisdiction … comport[s] with traditional notions of fair play and substantial justice." *Rogers v. City of Hobart*, 996 F.3d 812, 819 (7th Cir. 2020) (citation omitted).

The first two elements limit courts' specific jurisdiction to claims that "arise out of"—or relate to—"contacts that the defendant [itself] creates with the forum State." *Id.* at 819–20 (cleaned up) (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)). For a court to "exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State," *Walden*, 571 U.S. at 284, a connection that is deliberate, not "a result of random, fortuitous, or attenuated contacts, or the unilateral activity of another party of a third person,'" *NBA Props.*, 46 F.4th at 624 (quoting *Burger King*, 471 U.S. at 475); *see Ford*, 141 S. Ct. at 1025 ("The contacts must be the defendant's own choice …." (citation omitted)).

The link between the suit and the defendant's forum contacts need not necessarily be causal—the constitutional standard "contemplates that some relationships will support jurisdiction" even in the absence of a causal showing. *Ford*, 141 S. Ct. at 1026. "That does not mean anything goes," *id.*, but a defendant cannot contest jurisdiction solely on the ground that the plaintiff would have been injured irrespective of its forum contacts. Foreseeability remains key: "potential defendants should have some control over—and certainly should not be surprised by—the jurisdictional consequences of their actions." *Tamburo*, 601 F.3d at 701 (cleaned up).

After "it has been decided that a defendant purposefully established [suit-related] minimum contacts within the forum," the third element asks whether "the assertion of personal jurisdiction" might nonetheless offend due process. *Burger King*, 471 U.S. at 476. A number of factors are relevant to this inquiry, including (1) "the burden on the defendant," (2) "the forum State's interest in adjudicating the dispute," (3) "the plaintiff's interest in obtaining convenient and effective relief," (4) "the interstate judicial system's interest in obtaining convenient and effective relief," and (5) "the shared interest of the several States in furthering fundamental substantive social policies." *Id.* at 476–77 (quoting *World-Wide Volkswagen*, 444 U.S. at 292). The burden is on the defendant to show that exercising personal jurisdiction would offend due process, and it "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *NBA Props.*, 46 F.4th at 627 (quoting *Burger King*, 471 U.S. at 477).

### B.    Rule 12(b)(2) Motions to Dismiss

A plaintiff need not "alleg[e] personal jurisdiction in the complaint, but 'once the defendant moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the existence of jurisdiction.'" *Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 392 (7th Cir. 2020) (quoting *Purdue Rsch. Found. v. Sanofi Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003)). The weight of that burden depends on whether the court rules on the motion with or without "the benefit of an evidentiary hearing." *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 424 (7th Cir. 2010)). Where, as here, the Court does so without holding such a hearing, the plaintiff "bears only the burden of making a prima facie case for personal jurisdiction." *Id.*

A court evaluating a Rule 12(b)(2) motion generally must accept the truth of the complaint's well-pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor. But where the complaint's jurisdictional allegations are disputed by "affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Purdue*, 338 F.3d at 782–83 (citations omitted). If the plaintiff fails to do so, the presumption flips and the court "will accept as true any facts in the defendants' affidavits that do not conflict with" evidence introduced by the plaintiff. *Curry*, 949 F.3d at 393; *see also Swanson v. City of Hammond*, 411 F. App'x 913, 915 (7th Cir. 2011) (nonprecedential) (accepting

"allegations relating to personal jurisdiction as true except where the defendants refute them through undisputed affidavits" (citations omitted)).[2]

## C.   Jurisdictional Discovery

District courts have discretion to authorize limited discovery into jurisdictional issues. *See In re Sheehan*, 48 F.4th 513, 526 (7th Cir. 2022). The Seventh Circuit has cautioned, however, that "[a] plaintiff must be able to establish a colorable or prima facie showing of personal jurisdiction before discovery should be permitted." *Id.* (cleaned up). The Seventh Circuit has rarely applied this standard, but courts in this

---

[2]      In *Curry*, the Seventh Circuit stated that where a defendant introduces an affidavit in support of a Rule 12(b)(2) motion, courts should "accept as true any facts in the … affidavits that do not conflict with anything in the record, either by way of [the] complaint or other submissions." 949 F.3d at 393. Howell appears to cite *Curry* for the proposition that where the Rosas declaration conflicts with jurisdictional allegations in her complaint, the complaint controls. [Dkt. 40 at 2–3.] The Court disagrees with that reading.

Prior to *Curry*, the Seventh Circuit consistently took the opposite view—that a plaintiff must respond to a jurisdictional affidavit with facts of her own and that a failure to do so establishes the truth of the facts in the affidavit, at least for the purposes of ruling on the motion to dismiss. *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987) (holding that jurisdictional "allegations … are to be taken as true *unless* controverted by the defendants' affidavits" (emphasis added and citation omitted)); *accord Geist v. Martin*, 675 F.2d 859, 862 (7th Cir. 1982); *Purdue*, 338 F.3d at 782–83; *Swanson*, 411 F. App'x at 915. There is no indication that *Curry* meant to overrule these decisions *sub silentio*, and district courts continue to apply the old rule. *See, e.g.*, *Hill v. AMB Sports & Ent., LLC*, 2023 WL 2058066, at *3 (N.D. Ill. Feb. 16, 2023); *Kukovec v. Estée Lauder Cos.*, 2022 WL 16744196, at *1 (N.D. Ill. Nov. 7, 2022).

As the Court sees it, the language in *Curry* that Howell quotes merely recognized that affirmative evidence can be introduced "by way of" the complaint, just as it can be introduced by way of an affidavit—for example, by virtue of a written document incorporated into the pleadings under Federal Rule Civil Procedure 10(c). Were the rule otherwise, jurisdictional affidavits could be used only to assert facts supplementary to—as opposed to inconsistent with—the complaint. While *Curry* may be semantically susceptible to such an interpretation, it is implausible that the Seventh Circuit would deviate from decades of settled precedent without acknowledging its intention to do so. *See* 7th Cir. R. 40(e) (requiring an opinion that would overrule circuit precedent first to be circulated to active circuit judges). Other statements in Howell's opposition brief suggest that this might be her understanding as well. [*See, e.g.*, Dkt. 40 at 5 ("[W]hen analyzing a Rule 12(b)(2) motion, the court must accept all *uncontroverted* facts alleged in the complaint as true.").] The Court clarifies its position here in case Howell does, in fact, maintain that the complaint trumps inconsistent affidavits.

district generally agree that the requisite showing is not difficult to make. *See, e.g.,*
*Kosar v. Columbia Sussex Mgmt., LLC*, 2021 WL 4499494, *2 (N.D. Ill. June 1, 2021)
(citing cases). "In general, courts allow jurisdictional discovery if the plaintiff can
show an ambiguity exists or that some jurisdictional facts are unclear," *id.* (citation
omitted), but a plaintiff is not "entitled to discovery to establish essentially
speculative allegations necessary to personal jurisdiction," *Sheehan*, 48 F.4th at 527
(citations omitted). Moreover, the proposed discovery must be material to the
existence of jurisdiction, otherwise discovery would, at best, be a wasteful and
pointless exercise and, at worst, a tool for abuse. *See id.* For example, discovery is
proper to resolve ambiguities about when the defendant relocated its principal place
of business out of the forum state, *see Kosar*, 2021 WL 4499494, at *2, but not when
the plaintiff seeks to discover facts unrelated the defendant's suit-related contacts
with the forum, *see Sheehan*, 48 F.4th at 527 (affirming the denial of discovery).

## III.    Jurisdictional Allegations and Evidence

The Court now turns to the allegations and evidence at issue, which fall into
three categories: the jurisdictional allegations in the amended complaint, the Rosas
declaration, and Howell's rebuttal evidence. Because the Court has not held an
evidentiary hearing, Howell's jurisdictional allegations are presumptively true unless
squarely refuted by affirmative evidence, in which case Defendants' evidence is taken
as true unless Howell's evidence raises a dispute. The Court will resolve all disputes
in Howell's favor. *See Curry*, 949 F.3d at 393; *uBID*, 623 F.3d at 423–24; *Purdue*, 338
F.3d at 782–83.

A.      **Howell's Jurisdictional Allegations**

The amended complaint's jurisdictional allegations cover the relationship between Defendants, in particular the degree to which Bumble, as corporate parent, controls Buzz Holdings and Bumble Trading; Defendants' responsibility for Badoo's ownership and operation; and Defendants' forum contacts.

1.      **The Defendants**

Bumble Inc. was incorporated in Delaware on October 5, 2020. [Dkt. 22 ¶ 27.] Sometime before going public on February 16, 2021, the corporation underwent a reorganization and became "a holding company," with "a controlling equity interest in Buzz Holdings L.P." as Bumble's "sole material asset." [*Id.* ¶ 28.] Buzz Holdings is a Delaware limited partnership, and Bumble is its general partner. [*Id.* ¶ 32.] Perhaps contradicting the allegation that Bumble's sole material asset is its stake in Buzz Holdings, Bumble Trading LLC, a Delaware LLC, is allegedly a wholly owned subsidiary of Bumble. [*Id.* ¶¶ 33–34.] Each Defendant has its principal place of business in Austin, Texas. [*Id.* ¶¶ 27, 32, 34.]

2.      **Operational Control over the Badoo App**

Citing Bumble's 2021 Form 10-K, filed with the Securities and Exchange Commission ("SEC"), Howell alleges that Bumble and its subsidiaries "operate[ ] as a single operating segment." [*Id.* ¶ 30.] Bumble allegedly "operates and controls all of the business and affairs of Buzz Holdings" [*id.* ¶ 29], which "operates the Badoo dating app" [*id.* ¶ 32]. By virtue of that control, Bumble "has the obligation to absorb losses and receive benefits from Buzz Holdings." [*Id.*] And through its control of Buzz Holdings' subsidiaries, Bumble allegedly "conduct[s] its business." [*Id.*]

10

In other words, on Howell's account, Bumble is more than a mere owner; it is the center of *de facto* control over Bumble's various business interests. She cites Bumble's September 2021 SEC Form 10-Q to confirm this understanding. There, Bumble allegedly admits to "'provid[ing] online dating and social networking platforms through subscription and credit-based products … [and] provid[ing] these services through websites and applications that it owns and operates,'" including "two dating apps, Bumble and Badoo." [*Id.* ¶ 31.]

Howell has less to say about Bumble Trading, which allegedly "is responsible for the marketing and advertising of the Badoo dating app in the United States." [*Id.* ¶ 33; *see also id.* ¶ 34.] Further, Bumble Trading allegedly "is a controller of personal information collected and processed through the Badoo dating app." [*Id.* ¶ 34.]

### 3. Defendants' Illinois Contacts

Howell's complaint generally does not attempt to distinguish between Bumble, Buzz Holdings, and Bumble Trading for purposes of establishing minimum contacts with Illinois. She instead refers to them collectively as "Defendants" and attributes to all of them a joint, undifferentiated course of conduct. On that account, all three Defendants "own and operate Badoo" and the "Badoo dating app," and all three Defendants "collect information harvested from the Illinois-based devices of Illinois residents" for purposes of profile verification. [*Id.* ¶¶ 1, 15.] Howell alleges that by doing so, Defendants "exposed residents of Illinois to ongoing privacy risks within Illinois" through "the collection, capture, disclosure, redisclosure and dissemination of their Biometric Data." [*Id.* ¶ 14.]

11

Defendants' wrongful conduct is allegedly linked to Illinois in a variety of ways. [*Id.*] The Badoo app operates on "a freemium model whereby use of the service is free and a subset of … users pay for subscriptions or in-app purchases to access premium features." [*Id.* ¶ 16.] Defendants have sought to generate revenue from Illinois users via local marketing campaigns calculated to build "brand awareness and encourage Illinois residents to use the Badoo dating app." [*Id.* ¶ 18.]

For example, "[i]n 2012, Defendants were a festival partner and sponsor at the Pitchfork Music Festival in Chicago's Union Park." [*Id.* ¶ 19.] In addition to "creat[ing] a website specifically dedicated to market[ing] and promot[ing]" the Badoo "app at the … festival" [*id.*], "Defendants' employees advertised the … app out of a tent station with signs imploring attendees" to download the app [*id.* ¶ 20.] Individuals who did so "received free sunglasses and were entered to win tickets to the V.I.P. area." [*Id.*] Similarly, Defendants "had a tent station at a street festival in Chicago's Wicker Park neighborhood in 2012." [*Id.* ¶ 21.]

In addition to these event-specific campaigns, Defendants allegedly "market and promote the Badoo dating app with targeted location-specific content directed to users in large U.S. cities, including Chicago." [*Id.* ¶ 22.] As an example, Howell notes a job posting shared by "Bumble Inc.'s Global Head of Editorial Content," which "advertised that [Bumble] was hiring a Chicago-based writer for a local cultural piece for use on the Badoo dating app." [*Id.*] According to Howell, Defendants use such "content to deliberately market and target Illinois residents." [*Id.* ¶ 23.]

12

Bumble's marketing efforts have allegedly succeeded. Howell alleges that "Defendants generate revenue from thousands of paying users who reside in Illinois." [*Id.* ¶ 16.] In her view, Defendants' conduct "constitutes purposeful activity directed at devices and individuals in Illinois." [*Id.* ¶ 17.]

### B. The Rosas Declaration

In support of their motion to dismiss, Defendants offer the sworn declaration of Christopher Rosas, Vice President of Tax and Treasury at Bumble Trading. [Dkt. 36-1 ¶ 1.] Rosas is "responsible for global tax, treasury and transfer pricing matters for Bumble Trading LLC and its direct and indirect affiliates, including Bumble Inc. and Buzz Holdings L.P." [*Id.* ¶ 2.] The Rosas declaration expressly refutes much of the complaint's jurisdictional allegations.

Rosas takes aim at both the complaint's jurisdictional allegations and its core substantive allegations. As to the latter, he states that no Defendant "design[ed] the Badoo dating application" or has "ever owned, controlled, operated, or advertised it." [*Id.* ¶ 11.] Rosas denies that any Defendant has (1) "ever collected or stored Badoo-user information, including biometric information," or (2) "operated any servers related to the Badoo dating application or Badoo-user information." [*Id.* ¶ 12.]

As to Howell's jurisdictional allegations, Rosas first discusses Bumble and Buzz Holdings, both of which, he says, are "holding companies that conduct no operating business in any state, including Illinois." [*Id.* ¶ 6.] Lacking any operational business, neither Bumble nor Buzz Holdings: "market[s] or sell[s] products (including the Badoo dating application)"; "generate[s] any revenue from Illinois, or elsewhere"; "is registered to do business in Illinois"; has authorized a "registered agent for service

13

of process in Illinois"; has "any employees[,] … officers," "offices or other physical assets in Illinois"; or "keep[s] any corporate records in Illinois." [*Id.* ¶¶ 7–10.]

Rosas is somewhat less sweeping in his denial of Bumble Trading's Illinois contacts. Rosas does not deny that Bumble Trading engages in business in and generates revenue from Illinois. [*See id.* ¶ 7.] Nor does he deny that Bumble Trading has employees or officers in the Illinois. [*See id.* ¶ 8.] Although not itself evidence, Rosas's silence is relevant because the complaint's allegations are presumed true to the extent unrefuted by Rosas. As with Bumble and Buzz Holdings, however, Rosas does declare that Bumble Trading "do[es] not have any offices or other physical assets in Illinois" and does not "keep any corporate records in Illinois." [*Id.*]

## C.  Badoo's Privacy Policy and Bumble's SEC Filings

In addition to the screenshots in her complaint, Howell has come forward with two sources of evidence to contest the Rosas declaration: Badoo's privacy policy [Dkt. 48-1] and two of Bumble's SEC filings, its September 2021 Form 10-Q [Dkt. 42-1] and 2021 Form 10-K [Dkt. 42-2].

Badoo's privacy policy indicates that Bumble Trading is involved with the operation of the Badoo app. It states: "The following Badoo Group entities act as the data controllers of the personal information collected and processed through the Badoo App and Sites: Badoo Trading Limited and Bumble Trading LLC (referred to in this Policy as 'we' and 'us')." [Dkt. 48-1 at 2.][3] It also states: "When you download

---

[3]     Citations to exhibits refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

the [Badoo] App and create an account …, we"—including Bumble Trading—"may collect certain information … about you, such as … [p]hotographs." [*Id.* at 2–3.]

Bumble's SEC filings are "consolidated reports, describing the operations of not just [Bumble], but all its subsidiaries as well." *See Evans v. Wright Med. Tech., Inc.*, 2019 WL 5390548, at *4 (N.D. Ind. Oct. 21, 2019). In the definition section, the Form 10-Q notes that "'Bumble,' the 'Company,' 'we,' 'us' and 'our' refer to Bumble Inc. and its consolidated subsidiaries." [Dkt. 42-1 at 4.] It also defines Buzz Holdings as "Bumble Holdings." [*Id.*][4] Later, the 10-Q states, "All references to the 'Company,' 'we,' 'our' or 'us' in this report are to Bumble Inc." [*Id.* at 16.] The more comprehensive Form 10-K contains identical definition provisions. [Dkt. 42-2 at 5 ("'Bumble,' the 'Company,' 'we,' 'us' and 'our' refer to Bumble Inc. and its consolidated subsidiaries. … 'Bumble Holdings' refers to Buzz Holdings ….."), 89 ("All references to the 'Company,' 'we,' 'our' or 'us' in this report are to Bumble Inc.").]

The 10-Q describes Bumble's business as follows: "The Company provides online dating and social networking platforms through … dating products servicing North America, Europe and various other countries around the world. The Company provides these services through websites and applications that it owns and operates." [Dkt. 42-1 at 15.] "Bumble Inc. was incorporated ... for the purpose of facilitating … transactions in order to operate the business of Buzz Holdings … and its subsidiaries." [*Id.*] "As the general partner, Bumble Inc. operates and controls all of the business and affairs, and through [Buzz Holdings] and its subsidiaries, conducts

---

[4]     For the sake of clarity and consistency, the Court will change references to "Bumble Holdings" to "Buzz Holdings" in quotations.

the business." [*Id.*] The 10-K adds, "In 2021, we operated two apps, Bumble app and Badoo app …." [Dkt. 42-2 at 9.] "On Badoo app we continually invest in the safety and security of our users. … Badoo app prioritizes verification of users …." [*Id.* at 12.] "We monetize both the Bumble and Badoo apps via a freemium model …." [*Id.* at 57.]

## IV. Analysis

Recall that to establish specific personal jurisdiction over Defendants, Howell must show: (1) that each Defendant "has purposefully directed [its] activities at the forum state or purposefully availed [itself] of the privilege of conducting business in the state"; (2) that "the alleged injury arises out of or relates to [each] defendant's forum-related activities; and (3) that the "exercise of personal jurisdiction … comport[s] with traditional notions of fair play and substantial justice." *Rogers*, 996 F.3d at 819 (citation omitted). In this procedural posture, Howell need only make a prima facie showing that personal jurisdiction exists, with all evidentiary disputes resolved in her favor. *See uBID*, 623 F.3d at 423–24.

Defendants have entered a special appearance to contest personal jurisdiction. [Dkt. 36 at 1 n.1.] Accepting as true Howell's allegations that the Badoo app unlawfully collected her biometric data, Defendants deny all involvement with the app. According to them, Howell "simply sued the wrong entities." [Dkt. 41 at 5.] "[A]s a general proposition, each defendant's contacts with the forum State must be assessed individually." *Purdue*, 338 F.3d at 788 n.17 (cleaned up).

As discussed below, Howell has made a sufficient showing that personal jurisdiction is proper over Bumble Trading, but likely not over Bumble or Buzz Holdings, although it is a close question. Due to the closeness of the issue and the

16

interests of fairness and efficiency, the best path forward is to require the parties to conduct targeted jurisdictional discovery from all three Defendants.[5]

## A. Bumble Trading

The Court begins with Bumble Trading because, as the only Defendant that is not a holding company, the case for exercising personal jurisdiction over it is the strongest. For the reasons given below, the Court finds that Howell has made the requisite prima facie showing of personal jurisdiction as to Bumble Trading.

### 1. Involvement with Badoo App

The Court begins with a threshold question: Is there a dispute as to whether Bumble Trading owns or controls the Badoo app? Howell alleges that Bumble Trading is "responsible for the marketing and advertising of the Badoo dating app." [Dkt. 22 ¶ 34.] Defendants assert that Bumble Trading has "nothing to do with the Badoo app" and cite the Rosas declaration as support. [Dkt. 36 at 8; Dkt. 36-1 ¶¶ 11–12.] If Howell lacks evidence to dispute this point, the Court cannot exercise personal jurisdiction

---

[5] The Court previously raised a potential issue of subject-matter jurisdiction because without evidence that Defendants were involved with the Badoo app, it would be impossible for Howell to demonstrate that her injury was fairly traceable to Defendants' conduct, a necessary element of Article III standing. *See Dinerstein v. Google, LLC*, 73 F.4th 502, 511 (7th Cir. 2023). In light of Howell's supplemental filing [Dkt. 48], the Court is satisfied that there is no subject-matter jurisdiction issue it must address at this stage. To the extent that Defendants' suit-related contacts with Illinois are sufficient for the Court to exercise personal jurisdiction over them, those contacts are sufficient to support traceability, and to the extent that Defendants' contacts are insufficient to support personal jurisdiction, the Court can dismiss on that basis without needing to first address subject-matter jurisdiction. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 578 (1999) ("[I]n cases originating in federal court, there is no unyielding jurisdictional hierarchy. Customarily, a federal court first resolves doubts about its jurisdiction over the subject matter, but there are circumstances in which a district court appropriately accords priority to a personal jurisdiction inquiry."). Of course, issues of subject-matter jurisdiction are never waived, so the Court may need to assess its jurisdiction at a later stage of the litigation, but it is unnecessary to do so now.

because, with no connection to the app via which Howell's biometric information was gathered, Bumble Trading could not have sufficient suit-related contacts to make exercising personal jurisdiction proper. *See Rogers*, 996 F.3d at 819.

Howell's evidence is sufficient to put this point into dispute. Defendants do not dispute that the marketing activities Howell identifies occurred, and Badoo's privacy policy shows that Bumble Trading has at least some connection with the Badoo app as a "data controller[ ] of the personal information collected and processed through the Badoo App." [Dkt. 48-1 at 2.] Bumble's 10-K states that "we operate[ ] two apps, Bumble app and Badoo app," and defines "we" to mean Bumble Inc. and its subsidiaries, including Bumble Trading. [Dkt 42-2 at 5, 9, 132 (emphasis added).][6] Together, this evidence shows that Bumble Trading is involved with the Badoo app, though it is not clear whether its involvement includes marketing and advertising the app. Because the Court must resolve disputes in Howell's favor, *Curry*, 949 F.3d at 393, and because Defendants fail to show that the SEC filings or Badoo's privacy policy are inconsistent with Bumble Trading's involvement—by, for example, producing more comprehensive evidence about Bumble Trading's activities or who does market and advertise Badoo—the Court finds that there is a dispute as to whether Bumble Trading is involved in marketing and advertising the Badoo app.

---

[6]     Elsewhere, the 10-K states that "we" refers only to Bumble without mentioning its subsidiaries. [Dkt. 42-2 at 89.] At this stage, the Court must interpret this language in Howell's favor, which here means inferring that subsidiaries are involved in the operation of the Badoo app. This conclusion is also consistent with Defendants' position that Bumble itself being a holding company that conducts no business. [Dkt. 36-1 ¶ 6.]

2.      **Purposeful Availment or Direction**

Turning to the test for specific personal jurisdiction, the first element requires that Bumble Trading "purposively availed itself of the laws of [Illinois] by availing itself of the privilege of doing business in the state or by purposively directing activities at the state." *NBA Props.*, 46 F.4th at 621 (citation omitted). The Rosas declaration denies that Bumble Trading has any connection to Illinois based on its state of organization, where its principal place of business is located, the citizenship of its members, and the location of its officers, corporate assets, or corporate records. [Dkt. 36-1 ¶¶ 5, 10.] Howell does not dispute these points; instead, she argues that Bumble Trading established sufficient minimum contacts by marketing and making available the Badoo app in Illinois. [Dkt. 40 at 6–9.] The Court agrees with Howell.

Howell alleges that Bumble Trading conducted Chicago-specific marketing between 2012 and 2022. In 2012, Badoo had a physical presence at festivals in Chicago, where it marketed the app. [Dkt. 22 ¶¶ 19–21.] In early 2022, Badoo allegedly called for freelance writing about individuals' experiences with the Badoo app in cities including Chicago. [*Id.* ¶ 22.][7] Further, when individuals navigate to the Chicago page on the Badoo app (or perhaps the Badoo website), Badoo invites new users to sign up by saying, "In Chicago, Badoo is the ideal place to flirt, get to know

---

[7]     The Court infers an early 2022 date for the call for writing about Badoo because Howell accessed the post on April 4, 2022, and the post gives a time stamp of "2mo," suggesting it was posted at least two but less than three months earlier. [Dkt. 22 ¶ 22 & n.7.] In addition, the parties do not discuss which corporate entity Bumble's Global Head of Editorial Content works for, but since Bumble Inc. is a holding company, in the absence of evidence to the contrary, it is reasonable to infer that there is a sufficient chance that she works for Bumble Trading or an entity directed by it to allow this post to contribute to Howell's showing of personal jurisdiction.

19

each other, maybe even go on a date," and suggesting dating activities to try in Chicago. [*Id.* ¶ 23.] These marketing efforts have allegedly resulted in many Illinois Badoo users, including thousands who pay for premium features. [*Id.* ¶ 16.]

Defendants' primary argument regarding the first requirement for personal jurisdiction is that the Court should consider only whether Bumble Trading purposely directed conduct toward Illinois, not whether it purposefully availed itself of the privilege of doing business in Illinois. [Dkt. 36 at 7; Dkt. 41 at 5–6.] In Defendants' view, in cases involving "intentional torts, the inquiry focuses on whether the conduct underlying the claims was purposely directed at the forum state," *Tamburo*, 601 F.3d at 702 (citations omitted), and BIPA claims are analogous to intentional torts, so only the purposeful direction standard applies. Defendants cite no Seventh Circuit case holding that BIPA claims must be evaluated under purposeful direction only, and they offer no authority for the proposition that this Court can narrow a test created by the Supreme Court based on a mere analogy. Further, while Defendants claim that analyzing BIPA claims under purposeful direction and not purposeful availment is common practice in the Seventh Circuit, they rely on a single district court opinion that reasoned based on this analogy but did not suggest that only purposeful direction was the proper analytical standard for BIPA claims. *See Stein v. Clarifai, Inc.*, 526 F. Supp. 3d 339, 343–44 (N.D. Ill. 2021). Defendants are mistaken; courts in this district regularly evaluate personal jurisdiction in BIPA cases in terms of purposeful availment. *See, e.g.*, *Dzananovic v. Bumble, Inc.*, 2023 WL 4405833, at *3–4 (N.D. Ill.

July 7, 2023); *Redd v. Amazon Web Servs., Inc.*, 2023 WL 3505264, at *1–2 (N.D. Ill. May 17, 2023). The Court sees no reason to disregard purposeful availment.

Howell has made a sufficient showing that Bumble Trading purposefully availed itself of the privilege of doing business in Illinois. In *Illinois v. Hemi Group LLC*, the Seventh Circuit found sufficient minimum contacts where the defendant "maintained commercial websites through which customers could purchase cigarettes, calculate their shipping charges using their zip codes, and create accounts" and the defendant "would ship to any state … except New York." 622 F.3d 754, 757–58 (7th Cir. 2010). The Seventh Circuit rejected the argument that these sales were unilateral because of the defendants "own actions that led up to and followed the sales," including establishing the websites, "[holding] itself out as open to do business with every state (including Illinois) except New York," and fulfilling physical orders. *Id.* at 758; *see also uBID*, 623 F.3d at 427–28 (marketing campaigns including physical ads placed in Illinois created minimum contacts). As explained above, the Court infers Bumble Trading's involvement with Badoo marketing activities, which were similar to those in *Hemi*. The internet infrastructure supporting the Badoo app was set up; the app was made widely available, including in Illinois; and it was held out as open for business in Illinois via marketing events and online content encouraging Chicagoans to use the app. *See Hemi*, 622 F.3d at 757–58. While no physical Badoo product was shipped to Illinois, that fact does not defeat personal jurisdiction when contacts are otherwise sufficient. *See uBID*, 623 F.3d at 429.

21

Defendants argue that *Hemi* and *uBID* are inapposite "because Defendants do not sell or ship products to Illinois, or take any 'steps' after the user downloads the app. … Once a user downloads the Badoo app, that is the end of the transaction between the user and (allegedly) Defendants: no further steps are needed." [Dkt. 41 at 6–7.] This description of Badoo users' relationship with the app is too narrow. The aim in marketing the Badoo app is not to gain downloads, but to gain users, preferably those who pay for premium features, as Badoo's promotional materials recognize. [*E.g.*, Dkt. 22 ¶ 23 (Badoo advertisement that emphasizes "over 100,000 new users every day" and dating activities the app facilitates).] The relationship with users that Badoo's marketing materials solicit is one of ongoing use, not a one-time download. Just as reaching out to Illinois to sell cigarettes or web services creates sufficient minimum contacts for personal jurisdiction, *see Hemi*, 622 F.3d at 757–58; *uBID*, 623 F.3d at 427–29, Howell has made a prima facie case that Bumble Trading, by promoting the Badoo app, created sufficient minimum contacts with Illinois, *accord Dzananovic*, 2023 WL 4405833, at *3–4 (finding sufficient minimum contacts for Bumble Trading for similar reasons with respect to the Bumble app).

### 3.  Relation Between Contacts and Litigation

The Court now turns to the second personal jurisdiction requirement, whether Howell's "alleged injury arises out of or relates to [Bumble Trading's] forum-related activities." *Rogers*, 996 F.3d at 819 (citation omitted). The Court finds that her injury does relate to Bumble Trading's forum contacts. The analysis is straightforward. Through its marketing efforts between 2012 and 2022, Bumble Trading encouraged Illinoisans to download and use the Badoo app. Since 2016, Badoo has incentivized

22

all users to use the profile verification feature—because it comes with a "stamp of approval" that the user is who they claim to be—and has required many users to verify themselves. [Dkt. 22 ¶¶ 44–45, 47.] Howell alleges that she was injured when Badoo's profile verification collected her biometric data in violation of BIPA. On this telling, it is foreseeable that, if routine use of the Badoo app injures an Illinois user like Howell, Bumble Trading might be haled into court in Illinois. *See World-Wide Volkswagen*, 444 U.S. at 297 ("[T]he foreseeability that is critical to due process analysis … is that the defendant's conduct and connection with the forum State are such that [it] should reasonably anticipate being haled into court there." (citations omitted)); *see also Dzanovic*, 2023 WL 4405833, at *5–6 (finding Bumble app marketing-based forum contacts sufficiently related to BIPA litigation).

Defendants unsuccessfully attempt to resist this conclusion. They first argue that this litigation does not arise from or relate to Bumble Trading's contacts with Illinois because "Plaintiff does not allege that she attended these [marketing] events or downloaded the Badoo app as a result of any of the alleged in-state activities. Nor could she; she has been a regular Badoo user since 2016, four years after the two festivals in 2012." [Dkt. 36 at 12.] But the Supreme Court has rejected the notion "that only a strict causal relationship between the defendant's in-state activity and the litigation will do." *Ford*, 141 S. Ct. at 1026. Recognizing this, Defendants contend that Howell's "claims are based on the alleged collection of her biometric data through her use of the Badoo app's profile verification feature, not on any marketing

activities," which makes Bumble Trading's marketing-based contacts too attenuated to support personal jurisdiction in this case. [Dkt. 41 at 7.] These efforts fall flat.

Defendants first try to distinguish Bumble Trading's conduct from that in *Ford*, arguing that this case features an intervening step that makes this litigation not arise out of Bumble Trading's forum contacts. [*Id.* at 8.] There, say Defendants, "the plaintiffs alleged that the 'defective Ford vehicles caused the crash and resulting harm,'" [*id.* (quoting 141 S. Ct. at 1028], but this case features "an extra step":

> Plaintiff's download and use of the Badoo app, alone, did not cause Plaintiff's BIPA injury; it was her alleged use of the app's profile verification feature. Even if that feature was "required," Plaintiff still could have chosen to discontinue using the app instead of verifying her profile. Her decision instead to upload a photo is an intervening "unilateral activity" that cannot give rise to personal jurisdiction.

[*id.*]. This argument misses the mark; whether a defendant's forum contacts derive from the defendant's own conduct or unilateral activity by the plaintiff is relevant to the first step of the personal jurisdiction inquiry, not the second, and Defendants cite no authority to the contrary. Separately, this argument has troubling implications— if using a product in the expected way or the way it is marketed constitutes a "unilateral choice" that prevents a state from exercising personal jurisdiction, virtually any affirmative act by a customer or user would thwart personal jurisdiction based on marketing. Indeed, under this logic, one could characterize choosing to drive a defective Ford instead of leaving it in the garage as a unilateral choice that defeats personal jurisdiction. *Cf. Ford*, 141 S. Ct. at 1028. That cannot be the rule.

Defendants' stronger argument is to focus on the strength of the marketing activity's relationship to the litigation. [Dkt. 41 at 8–9.] They contend that the

marketing in *Ford* was meaningfully stronger than the marketing Howell identifies, as she does not "point to any marketing activities directed at Illinois that even mention the profile verification feature, or that 'promised' anything related to the collection of biometric data." [*Id.* at 9.][8] But at this stage, Howell need only make a prima facie showing that Bumble Trading's contacts are sufficiently related to the litigation, which is readily inferable based on her allegations and the evidence in the record. First, the marketing in *Ford* is not as different as Defendants suggest—Ford advertised the vehicle models at issue there, 141 S. Ct. at 1028, and Bumble Trading allegedly advertised the app at issue here. And even if an injury caused by a specific feature of a product is distinct for jurisdictional purposes from an injury caused by the product more generally, the Court is satisfied that Badoo's verification feature is sufficiently central to the app that Howell's BIPA claims are sufficiently related to marketing the app more broadly. Security and safety are key features of the Badoo app, and verification is key to that effort. [*See, e.g.*, Dkt. 42-2 at 12–13.] Defendants have produced no evidence refuting the notion that information about safety and verification was mentioned in Badoo-related marketing, and it is reasonable to infer that marketing efforts would emphasize the app's strengths.

Defendants' arguments about cases from this district also fail to persuade. They cite *Gullen v. Facebook.com, Inc.* for the proposition that advertising in a state is unrelated to claims regarding the collection of biometric data. 2016 WL 245910, at

---

[8] The Court disregards Defendants' point that Howell "does not claim that she ever attended any of [the in-person marketing] events or saw any of [the Chicago-based online] content, let alone that she downloaded the app or used the profile verification feature because of it" [Dkt. 41 at 9], because this is a causation argument.

*2–3 (N.D. Ill. Jan. 21, 2016). [Dkt. 36 at 12–13.] That may well have been true in *Gullen*, where the complaint apparently did not allege a connection between marketing activities and the litigation. *See id.* at *2 ("[Those] contacts have no relationship to this suit, which arises from Facebook's alleged collection of biometric data from a photo, not from its sales, marketing, or other business activity in Illinois."). But here, as the Court has explained, Howell has established at least a prima facie case that her suit relates to Bumble Trading's Illinois contacts. [*Contra* Dkt. 36 at 13 (also citing *Snow Systems, Inc. v. Sneller's Landscaping, LLC*, 2019 WL 1317746 (N.D. Ill. Mar. 22, 2019), in which the defendant's contacts did not relate to the suit).] Defendants argue that in *Crumpton v. Haemonetics Corp.*, 595 F. Supp. 3d 687 (N.D. Ill. 2022), and *King v. PeopleNet Corp.*, 2021 WL 5006692 (N.D. Ill. Oct. 28, 2021), both of which found that exercising personal jurisdiction was proper, the defendants' contacts with the forum were more closely related to the litigation than here, but even if that is true, it doesn't change the fact that Howell made the requisite prima facie showing.[9] This is also the result reached in the most analogous case. *See Dzananovic*, 2023 WL 4405833, at *5–6.

### 4. Fair Play and Substantial Justice

Since Howell has made a prima facie showing that Bumble Trading purposely availed itself of the privilege of doing business in Illinois and that its forum contacts relate to this litigation, Bumble Trading may avoid being subject to personal

---

[9] The last case Defendants cite, *Edelson PC v. Girardi*, 2021 WL 303316 (N.D. Ill. July 19, 2021), is irrelevant to this discussion because Howell cited it only for the proposition that causation is not required [*see* Dkt. 40 at 12].

jurisdiction in Illinois if it can show that to exercise jurisdiction over it would offend traditional notions of fair play and substantial justice by "present[ing] a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *NBA Props.*, 46 F.4th at 627 (quoting *Burger King*, 471 U.S. at 477).

Defendants treat this step as an afterthought, pointing out that Bumble Trading has no meaningful connection to Illinois, such as being organized under Illinois law, having officers or officers there, or owning property in the state. [Dkt. 36 at 13–14; Dkt. 41 at 10.] They rely on *David White Instruments, LLC v. TLZ, Inc.*, but there, the fair play and substantial justice analysis related to a Hong Kong company, which would suffer a greater burden to litigate in Illinois than would a Delaware company with its principal place of business in Texas. *See* 2003 WL 21148224, at *7 (N.D. Ill. May 16, 2003). Further, the Seventh Circuit recently held that merely being a foreign party is not sufficient to avoid personal jurisdiction on the basis of fairness, noting Illinois's interest in providing a forum for its citizens and that the defendant "allege[d] no unusual burden in defending the suit in Illinois." *NBA Props.*, 46 F.4th at 627. So too here—Bumble Trading gives no reason why it would be unusually burdensome for it to defend this suit. *Accord Dzananovic*, 2023 WL 4405833, at *7 (finding no unusual burden on Bumble Trading to defend the suit in Illinois).

## B. Bumble and Buzz Holdings

With respect to the remaining Defendants, Bumble and Buzz Holdings, the key issue is whether there is sufficient evidence to dispute Defendants' assertion that these two holding companies have no involvement with the Badoo app. *See Purdue*,

338 F.3d at 782–83. This is a close question, but the Court is skeptical that Howell has raised a dispute as to personal jurisdiction over Bumble and Buzz Holdings.

There are two key differences between the evidence about Bumble Trading's contacts with Illinois and Bumble's and Buzz Holdings' contacts. First, the Badoo privacy policy indicates that Bumble Trading participates in the Badoo app operation, but no evidence suggests similar involvement by Bumble or Buzz Holdings. Second, Rosas states that these two entities are holding companies that conduct no business and have no connection to the Badoo app or any Badoo-related activities. [Dkt. 36-1 ¶ 6.] As a result, the case for inferring that Bumble or Buzz Holdings is involved with marketing or operating the Badoo app is weaker than for Bumble Trading.

As explained above, the Badoo privacy policy and the evidence that Bumble conducts its business through subsidiaries combined to put Rosas's assertion that Bumble Trading was uninvolved with the operation or marketing of the Badoo app into dispute. As to Bumble and Buzz Holdings, however, Howell can only rely on statements in the SEC filings, which are likely insufficient to raise a dispute as to this point. It is true that Bumble's 10-K and 10-Q describe use terms like "we" to refer to Bumble and its subsidiaries, and attribute the entire corporate family's activities to "us" without specifying which entities conduct which aspects of Bumble's business. But such representations in SEC filings are not necessarily sufficient to raise a dispute requiring an evidentiary hearing or a denial of a motion to dismiss for lack of personal jurisdiction. District courts in the Seventh Circuit have come out both ways on this question, and the effect of representations in such filings depends on the

28

specific points of dispute and the other evidence available. *Compare, e.g.*, *Fields v. Wright Med. Tech., Inc.*, 2016 WL 8715929, at *1, *3 (N.D. Ind. June 24, 2016) (denying motion to dismiss in part because SEC filings, along with other evidence, "contain representations which contradict [the defendant's] (presently) claimed non-involvement with" the product at issue), *with Kitt Holdings, Inc. v. Mobileye B.V.*, 2018 WL 3389747, at *2 (S.D. Ind. July 11, 2018) (granting motion to dismiss where SEC filings attributed conduct to the parent and its subsidiaries and identified certain entities as holding companies that did not own or control the relevant intellectual property).

The closest case on point is, of course, *Dzananovic*, which held that the plaintiff had created a dispute as to whether Bumble and Buzz Holdings were involved with the Bumble app. 2023 WL 4405833, at *4–5. That case is instructive, but there are differences between the evidence there and Howell's evidence. In *Dzananovic*, the court relied not only on representations in Bumble's SEC filings, but also a declaration from Bumble Trading's chief of staff, which stated, "Bumble, Inc. is the parent company of Bumble Trading, is involved in the marketing decisions of its subsidiaries, and is a party to the Bumble App's terms and conditions." *Id.* at *5. Combined with the SEC filings ambiguous representations about Bumble and its subsidiaries, the court concluded that "[w]ithout any additional information, th[e] statements [in the SEC filings] describing Bumble's activities plausibly include Bumble, Inc. and Buzz Holdings." *Id.* Thus, the court found that there was a dispute that precluded dismissing Bumble and Buzz Holdings from the lawsuit. *Id.*

Here, though, Howell lacks evidence indicating that Bumble is involved in its subsidiaries' marketing decisions, and certain representations in the SEC filings that *Dzananovic* did not address contradict the notion that Bumble and Buzz Holdings are involved with the Badoo app. Bumble's 10-K states: "Bumble Inc. is now a holding company, and its sole material asset is a controlling equity interest in Bumble Holdings" [Dkt. 42-2 at 4]; "[w]e are a holding company, and our consolidated assets are owned by, and our business is conducted through, our subsidiaries" [*id.* at 39]; and "Bumble Inc. has no independent means of generating revenue" [*id.* at 40]. And while Bumble's 10-K and 10-Q do not expressly state that Buzz Holdings is also a holding company, nothing in those forms contradicts Rosas's declaration that Buzz Holdings is a holding company that conducts no business of its own. [Dkt. 36-1 ¶ 6.] The Court therefore finds that Howell has failed to raise a dispute as to whether Bumble and Buzz Holdings are holding companies.

That finding likely means there is no reasonable dispute as to whether Bumble or Buzz Holdings is involved with operating or marketing the Badoo app under its own name. In ordinary parlance, holding companies are understood not to be involved in everyday business. *See, e.g.*, *Holding Company*, Black's Law Dictionary (11th ed. 2019) ("A company formed to control other companies, usu. confining its role to owning stock and supervising management. It does not participate in making day-to-day business decisions in those companies."); *Holding Company*, Merriam-Webster, https://www.merriam-webster.com/dictionary/holding%20company ("a company whose primary business is holding a controlling interest in the securities of other

30

companies"). Bumble's SEC filings establish that certain entities among Bumble and its subsidiaries engage in the business of running Badoo, but those representations alone do not permit the inference that the holding companies Bumble and Buzz Holdings participate in that business. *See Kitt Holdings*, 2018 WL 3389747, at *2 (reasoning similarly); *cf. Dzananovic*, 2023 WL 4405833, at *5 (finding a dispute where there was evidence of Bumble's involvement with the app at issue to bolster the SEC filings).

As against that, the Court must resolve any disputes in Howell's favor, and she counters by pointing out that Bumble's SEC filings state that it "operates as a single operating segment" [Dkt. 42-2 at 118; *see* Dkt. 40 at 1] and that in some places, the filings exclude subsidiaries from the definition of the company [*e.g.*, Dkt. 42-1 at 15 ("All references to the 'Company', 'we", 'our' or 'us' in this report are to Bumble Inc."); *see* Dkt. 48 at 4]. Further, Howell notes that some passages explicitly reference Bumble and Buzz Holdings, for example: "As the general partner of Bumble Holdings, Bumble Inc. now operates and controls all of the business and affairs of [Buzz Holdings], has the obligation to absorb losses and receive benefits from [Buzz Holdings] and, through [Buzz Holdings] and its subsidiaries, conducts our business." [Dkt. 42-1 at 39; *see* Dkt. 48 at 3.] But none of these representations is necessarily inconsistent with Bumble and Buzz Holdings being holding companies that do not conduct business of their own but merely hold controlling stakes in entities that do. Without evidence that Bumble or Buzz Holdings participates in the active operation

of the business, as was the case in *Dzananovic*, it may not be reasonable to infer that holding companies as opposed to their subsidiaries are conducting actual business.

The fact that subsidiaries may have sufficient forum contacts to make exercising personal jurisdiction proper does not necessarily establish that the Court has personal jurisdiction over the parent company. *Purdue*, 338 F.3d at 784, 788 n.17. "[W]here corporate formalities are substantially observed and the parent does not dominate the subsidiary, a parent and a subsidiary are two separate entities and the acts of one cannot be attributed to the other." *Reimer Express*, 230 F.3d at 944.[10]

Howell does not make a serious attempt to show that Bumble or Buzz Holdings dominates its subsidiaries to the degree necessary to impute their jurisdictional contacts to either holding company. She argues that Bumble "directs and controls the operations of Bumble Trading, a wholly-owned subsidiary," but her only evidence in support of this proposition appears to be that Bumble's SEC filings state that it "operates as a single operating segment." [Dkt. 40 at 1.] But "[p]arents of wholly owned subsidiaries necessarily control, direct, and supervise the subsidiaries to some

---

[10] The Seventh Circuit appears not to have addressed whether the same reasoning applies to limited partnerships like Buzz Holdings or limited liability companies like Bumble Trading, but other circuits have done so, and this conclusion is consistent with the rule that "each defendant's contacts with the forum State must be assessed individually." *Purdue*, 338 F.3d at 784 (cleaned up); *see Sher v. Johnson*, 911 F.2d 1357, 1365 (9th Cir. 1990) (holding that partners "have potential liability" based on their stake in the partnership "but they are independent for jurisdictional purposes"); *cf. Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. Kg.*, 295 F.3d 59, 67 (1st Cir. 2002) (rejecting "the bald proposition that personal jurisdiction over a partnership automatically conveys personal jurisdiction over each of the partners" but declining to determine the precise scope of when jurisdiction may be imputed). *But see Wolfson v. S & S Sec.*, 756 F. Supp. 374, 377 (N.D. Ill. 1991) ("Since the court has jurisdiction over the partnership, jurisdiction also exists over the general partners.").

extent," *Purdue*, 338 F.3d at 788 n.17 (internal quotation omitted), so the mere fact that Bumble and Buzz Holdings are parent companies is insufficient to impute Bumble Trading's contacts to the holding companies, and Howell fails to offer evidence of an unusual level of control necessary to do so, *cf. Dzananovic*, 2023 WL 4405833, at *5 (finding a genuine dispute as to Bumble's and Buzz Holdings' jurisdictional contacts where evidence indicated Bumble's directors were involved with Bumble Trading's marketing decisions). This evidence is likely insufficient to raise a dispute as to whether Bumble or Buzz Holdings is subject to personal jurisdiction in Illinois based on the jurisdictional contacts of its subsidiaries.

In sum, it is likely that Howell has failed to raise a genuine dispute as to whether Bumble or Buzz Trading is subject to personal jurisdiction here, but there are also reasonable arguments on the other side. As explained in the next section, the Court need not make a final determination on this question now.

### C. Jurisdictional Discovery

In addition to arguing that she has made a prima facie showing of jurisdiction with respect to each Defendant, to the extent that the Court is uncertain about its jurisdiction, she asks to take limited jurisdictional discovery. [Dkt. 40 at 14–15.] The Court agrees that jurisdictional discovery is warranted. While the Court has doubts about whether jurisdiction is proper as to Bumble and Buzz Holdings, the SEC filings raise at least some ambiguity on that point. The Court finds *Dzananovic* particularly instructive, as the court in that case found a dispute as to jurisdiction based on similar evidence to the evidence here. Permitting jurisdictional discovery here would not be a fishing expedition, but instead would clear up ambiguous jurisdictional facts.

*See Sheehan*, 48 F.4th at 526. Some entity in the Bumble family marketed the Badoo app and collected its users' data, allegedly in violation of BIPA. Defendants say Howell has sued the wrong entities [Dkt. 41 at 7], but it stands to reason that Bumble must know the correct ones, given its position at the top of the "single operating segment" [Dkt. 42-2 at 118].

In arguing that jurisdictional discovery is improper, Defendants largely reiterate their position that there is no ambiguity or relevant dispute as to Bumble's and Buzz Holdings' involvement with the Badoo app. [Dkt. 41 at 3–4.] They cite *Ticketreserve, Inc. v. viagogo, Inc.*, but there the plaintiff produced no evidence that the defendant had any connection with the website in question, which the court found insufficient to make a prima facie showing of jurisdiction or warrant jurisdictional discovery. 656 F. Supp. 2d 775, 782–83 (N.D. Ill. 2009). Here, in contrast, Howell has come forward with some evidence that could indicate Bumble and Buzz Holdings are connected with the Badoo app. Because the extent of their involvement is unclear, jurisdictional discovery is warranted. Taking limited jurisdictional discovery now is not all downside for Defendants, who insist that the Court lacks personal jurisdiction over Bumble Trading. Given that Howell has made a prima facie showing that jurisdiction is proper, the Court cannot accept Defendants' arguments regarding Bumble Trading at this stage. After discovery, however, Howell will need to prove her jurisdictional allegations by a preponderance of the evidence. *Purdue*, 338 F.3d at 782. Defendants will be able to renew their motion with respect to Bumble Trading— as well as Bumble and Buzz Holdings—and if they prevail, Bumble Trading will not

be subjected to full discovery, which it would have if the Court did not order jurisdictional discovery at this stage.

For these reasons, the Court grants Howell's alternative request for targeted jurisdictional discovery from all three Defendants.

## IV. Conclusion

The Court denies Defendants' motion to dismiss [Dkt. 35] without prejudice to refiling after the parties take limited jurisdictional discovery from Bumble, Buzz Holdings, and Bumble Trading. By separate order, the Court will instruct the parties as to next steps regarding that discovery.

Enter: 21-cv-6898
Date:  September 19, 2023

_____
Lindsay C. Jenkins
United States District Judge